# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DIANE DAWN ARELLANO,

Defendant-Appellant.

UNPUBLISHED
November 19, 2015

No. 322886
Genesee Circuit Court
LC No. 13-033463-FC

Before: SERVITTO, P.J., and WILDER and BOONSTRA, JJ.

PER CURIAM.

Defendant appeals by right her convictions, following a jury trial, of first-degree premediated murder, MCL 750.316(1)(a), and possession of a firearm during commission of a felony (felony-firearm), MCL 750.227b(1). The trial court sentenced defendant to life imprisonment for the murder conviction consecutive to a two- year sentence for felony-firearm, with credit for 489 days served. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This case arises out of the shooting death of defendant's husband, Michael Arellano. Defendant's son, Hunter Kircher, found Arellano in the basement of the home that defendant, Arellano, and Kircher shared. Responding Genesee County Deputy Sheriff Russell Sorenson testified that Arellano had a bullet hole in his chest, and that a bolt-action rifle and what appeared to be semi-automatic shell casings were found near the body. The Genesee County Deputy Medical Examiner determined that Arellano had one gunshot wound to his chest and one to his head, and that either wound alone would have been fatal.

Upon discovering the body, Kircher telephoned defendant, who was at a Jo-Ann Fabrics store in Burton Michigan, and told her that Arellano was hurt. A store employee, Kristina Griffin, testified that defendant was very distressed by this phone call. Griffin called 911 because she believed that defendant was too distraught to drive. She testified that at some point defendant entered the bathroom of the store, claiming she had begun menstruating. When defendant exited the bathroom, she was not wearing any pants and explained that she had "bled all over them." She indicated that her pants were tucked under her arm inside her coat. Griffin stated that she gave defendant a pair of pants from the break room. She testified that the police arrived and that defendant left in their squad car. The following day, the police recovered paper towels that were in the trash can in the bathroom. Griffin said they had dark red stains.

-1-

Kircher testified that defendant disposed of a pair of pants in a Jo-Ann Fabrics bag at a Dollar Den dumpster on the night of the shooting. He testified that defendant told him she had defecated and urinated in the pants and was embarrassed. The police later recovered pants from the dumpster that had apparent bloodstains. Various of the bloodstains were later matched to the victim and defendant.

Two days after the shooting, Burton Police found a silver semiautomatic handgun and a bottle of bleach in an area across the street from Jo-Ann Fabrics. The gun was registered to defendant. DNA on the pistol muzzle was matched to the victim. A firearms and tool marks examiner testified that two shell casings found near Arellano's body were determined to have been fired from the handgun, although he could not say whether the bullets found in Arellano's body were fired from the handgun. Both the handgun and the rifle found next to Arellano tested positive for chloride and chlorate, ingredients in bleach.

Relevant to defendant's appeal, Detective Pendergraff of the Michigan State Police testified that he interviewed defendant four times before her arrest; these interviews were recorded and played for the jury during trial, and transcripts of the interviews were entered into evidence. During the first three interviews, defendant offered various theories regarding Arellano's death, including that he died from heart complications, that he was shot by someone who was coming to buy car parts, and that he was shot by someone from the "projects." Defendant denied shooting Arellano during these interviews. During the fourth interview, after Pendergraff informed her that her gun had been found, defendant stated for the first time that she had shot the victim in self-defense because he was angry and was holding a rifle. Defendant described how the victim had allegedly held the rifle, and Detective Pendergraff enacted her description as part of his trial testimony. Pendergraff testified that defendant's description of how the victim had held the gun was not how a person would hold a rifle if the person was going to shoot it. The following colloquy then occurred between the prosecution and Pendergraff:

> *Q* [Prosecution]. Did you feel that she was telling you the truth?
>
> *A* [Detective Pendergraff]. The whole truth about what happened that night?
>
> *Q*. Yeah?
>
> *A*. No.
>
> *Q*. Why is that?
>
> *A*. Well, because of the evidence of the scene. Um, her claim that she didn't remember a lot of things—I mean, she was—her detail—her memory was pretty detailed up to the event and then all of a sudden that memory stops and gets spotty and then after the event, after being at Jo-Ann's, the memory increases a little bit. And there were some things at the scene that, um—that I could tell by the evidence that had taken place[,] I didn't feel that she had been truthful about.
>
> *Q*. What were the things specifically at the scene that you didn't think she was being truthful about?

*A*. Well, one was the rifle. Um, the other was —

*Q*. When you say the rifle, what do you mean about the rifle?

*A*. Well, the—the placement of the rifle and that he had been holding it pointing it at her. I didn't believe that to be true especially considering that if he had been holding the rifle—when she shot him it was right here at the chest. She would've had to have walked up to him past the rifle, put the gun to his chest, and pull[ed] the trigger.

Later, the prosecution asked Pendergraff: "[B]ased on your investigation in this case, what were you able to infer actually happened at the crime scene?" Pendergraff responded by offering his opinion as to how the crime had occurred, stating that he believed the victim was sitting at his computer when defendant "came down the stairs and walked up to him, put the gun to his chest, and pulled the trigger," that the victim fell to the floor, and that defendant "fired the second round in to [sic] the back of his head. I don't believe under the circumstances and from what the evidence indicates that he was holding that rifle when she came down the stairs."

The jury convicted defendant as described. This appeal followed, limited to the issue of whether Pendergraff's testimony was improper and whether defense counsel was ineffective for failing to object to its admission.

## II. STANDARD OF REVIEW.

Defendant did not object to this testimony at trial and thus the issue is unpreserved. *People v Carter*, 462 Mich 206, 214; 612 NW2d 144 (2000). We review unpreserved evidentiary issues for plain error affecting substantial rights. MRE 104(d); *People v Carines*, 460 Mich 750, 774; 597 NW2d 130 (1999).

> Under the plain error rule, defendants must show that (1) error occurred, (2) the error was plain, i.e., clear or obvious, and (3) the plain error affected a substantial right of the defendant. Generally, the third factor requires a showing of prejudice—that the error affected the outcome of the trial proceedings. Defendants bear the burden of persuasion. [*People v Pipes*, 475 Mich 267, 279; 715 NW2d 290 (2006) (footnotes omitted).]

Our review of defendant's accompanying claim of ineffective assistance of counsel is limited to mistakes apparent on the record. *People v McCrady*, 213 Mich App 474, 478-479; 540 NW2d 718 (1995).

## III. ANALYSIS

Defendant argues that Pendergraff improperly offered expert opinion testimony regarding the truth of defendant's description of events and regarding defendant's credibility, thereby improperly addressing the ultimate issue of defendant's guilt. Further, defendant claims that his attorney provided ineffective assistance of counsel by failing to object to this testimony. We disagree.

Lay testimony "in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." MRE 701; see also *People v Dobek*, 274 Mich App 58, 77; 732 NW2d 546 (2007). Where testimony is of a general matter and not in reference to any technical or scientific analysis, it is proper lay testimony. *Id*. at 78. This contrasts with expert opinion testimony under MRE 702, which relates to "scientific, technical, or other specialized knowledge."

"[T]he issue of an accused's guilt or innocence is a question for the trier of fact." *People v Bragdon*, 142 Mich App 197, 199; 369 NW2d 208 (1985). A witness "may not opine about the defendant's guilt or innocence in a criminal case." *People v Heft*, 299 Mich App 69, 81; 829 NW2d 266 (2012). However, testimony is permissible under MRE 701 where a "fair reading" reveals that the witnesses "were explaining the steps of their investigations from their personal perceptions." *Id*. at 83.

A fair reading of Pendergraff's testimony shows that it was proper under MRE 701. First, the detective's statements regarding the veracity of defendant's story were based on the evidence of the scene and defendant's changing descriptions of what had occurred. He specifically detailed the evidence that led him to question her version of events, and her recorded interviews supported his description. *Heft*, 299 Mich App at 82-83. Pendergraff's testimony was thus not a statement of guilt but an explanation of his investigation. *Id*. at 83.

Defendant's argument that Pendergraff's testimony regarding how the victim allegedly had held the rifle fails for the same reason. Defendant herself initially described in her recorded interview how the victim allegedly had held the rifle, and it was not improper for Pendergraff to reference the statements because they were statements of a party opponent. See MRE 801(d)(2). Moreover, Pendergraff's testimony was properly based on his rational perception of the evidence and how an individual intending to shoot would hold a rifle. Further, it was helpful in determining a fact at issue, namely, whether defendant had acted in self-defense. Thus, it was proper lay opinion testimony under MRE 701. Notably, Pendergraff did not express any opinion that defendant was guilty.

Pendergraff's more expansive opinion regarding what had likely occurred at the crime scene was more detailed, yet still rationally related to the evidence and explanatory of his investigation. More particularly, his opinion that the victim was sitting at his computer when the shooter "came down the stairs and walked up to him, put the gun to his chest, and pulled the trigger" was consistent with the fact that the victim had suffered a contact wound to the chest and that his DNA was found on the muzzle of the handgun. His opinion that the shooter "fired the second round in to [sic] the back of his head" was related to his perception of the crime scene and the description given by defendant.

A closer question is Pendergraff's reference to defendant as the shooter during his recitation of his opinion of what had transpired at the crime scene. In isolation, this reference could easily be read as Pendergraff's expression of an opinion of defendant's guilt or innocence. However, defendant's theory of the case was that she had shot defendant in self-defense. Therefore, the two competing theories of the case presented at trial both shared the element that defendant had shot Arellano. In light of the fact that defendant did not deny shooting defendant,

a fair reading of Pendergraff's reference to defendant as the shooter was permissible under MRE 701. *Id*. at 83.

Finally, substantial other evidence linked defendant to this crime and undermined her self-defense theory. Defendant had discarded clothing stained with the victim's blood, discarded her handgun, given inconsistent statements to police, and admitted to shooting the victim only after her handgun was found. Circumstantial evidence supported the inference that the murder weapon had been cleaned with bleach. In light of other properly admitted evidence, Pendergraff's testimony more likely than not was not outcome determinative, even if portions of it were admitted in error. *People v Benton*, 294 Mich App 191, 199; 817 NW2d 599 (2011). In sum, defendant has not shown plain error that affected her substantial rights.

Defendant has also not shown that her counsel was ineffective for failing to object to the testimony. To establish ineffective assistance of counsel, a defendant must show both that counsel's performance was below an objective standard of reasonableness under prevailing professional norms and that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *People v Lockett*, 295 Mich App 165, 187; 814 NW2d 295 (2012). "Effective assistance of counsel is presumed, and the defendant bears a heavy burden to prove otherwise." *People v Mack*, 265 Mich App 122, 129; 695 NW2d 342 (2005). As discussed, the admission of the challenged portions of Pendergraff's testimony was proper and, in any event, was not outcome determinative. Counsel is not ineffective for failing to raise a meritless objection. *People v Fike*, 228 Mich App 178, 182; 577 NW2d 903 (1998). And even if a timely objection would have resulted in some of Pendergraff's testimony being stricken, there was not a reasonable probability that such an action would have altered the result of the proceedings against defendant. *Lockett*, 295 Mich App at 187.

Affirmed.

/s/ Deborah A. Servitto
/s/ Kurtis T. Wilder
/s/ Mark T. Boonstra